HEWELT *v.* HEWELT.[1]

DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY.
On a bill for divorce on the ground of extreme cruelty, evidence examined, and *held*, insufficient to justify a decree for complainant.

Appeal from Wayne; Donovan, J. Submitted April 13, 1906. (Docket No. 24.) Decided July 23, 1906.

Bill by Caroline Hewelt against John F. Hewelt for a divorce. From a decree for complainant, defendant appeals. Reversed, and bill dismissed.

*E. A. Fink* (*Dohany & Dohany,* of counsel), for complainant.

*Seth W. Knight* (*Brennan, Donnelly & Van De Mark,* of counsel), for defendant.

BLAIR, J. Complainant filed her bill for a divorce against the defendant upon the ground of extreme cruelty. The principal charges of extreme cruelty contained in the bill as filed are that defendant compelled complainant to

---

[1] Rehearing denied November 7, 1906.

do a man's work upon the farm; " and when she told him that she was not able to do it—that she could not—he became impatient with her; that he called in his own family and relatives, and together with them insinuated that she was not sick; that he and they would insist that your oratrix should either be sick in bed or be able to work as she had before her sickness; that after about four months she was able to gradually resume heavier work again, and that her husband made her do the work of a man upon the farm, in addition to her household duties; that after the birth of her second child the same trouble again arose, and that the said defendant took your oratrix to the Lakeside Sanitarium at Grosse Pointe against her wishes and desires, where she was detained for about four months, and was subjected to outrageous and ill treatment; that in May, 1904, the said defendant wanted your oratrix to sign some papers for mortgaging their farm to the said defendant's father, that when your oratrix demurred he told her she was crazy; that he consulted his people and with them insisted that she must go to bed, and kept her confined in her room, and finally took your oratrix to Pontiac and had her confined in the asylum there without any hearing or adjudication as to her sanity; that he kept her there for about three months, finally yielding to her entreaties to take her away, but only on condition that she would be satisfied and do his bidding, and do the work he imposed upon her, and that she had to take up her work at once upon her return home;" that his conduct was generally abusive towards her; that he called her vile names and twitted her with being crazy, and upheld his mother in inducing the older child to disregard her authority, which, in connection with her fear that she would again be taken to an asylum, was the immediate occasion of her separating from defendant.

The answer of defendant denied all the charges of cruelty contained in the bill and alleged " that he has never treated his wife with cruelty in any manner whatever, but alleges that during this summer complainant

has treated her children with extreme cruelty almost every day to such an extent that the eldest boy refuses to stay with her.   *   *   *   That he has always uniformly been kind to her, and has never used cross words to her." At the close of the proofs as to the cause for divorce, complainant asked leave to amend her bill of complaint, "so as to conform to the proofs." Thereupon, the record shows the following occurred:

"*Mr. Knight:* I would ask that they suggest upon the record in what particulars they want the bill amended so that we may know what we have to meet.

"*Mr. Dohany:* We have charged extreme cruelty, and we have shown specific acts of cruelty, and I ask that the bill may be so amended as to show specific acts of cruelty shown by the proofs.

"*The Court:* I think that is proper.   *   *   *   The finding when made will follow the testimony as introduced.   We cannot reopen the case for further hearing.   We have given it a long and patient and considerate hearing; now, unusually long.

"*Mr. Knight:* Then I understand the court does not require the solicitor for complainant to state the particulars wherein he amends his bill of complaint.

"*The Court:* No, only as the pleadings and testimony have already shown."

The finding referred to by the court was filed on November 10th, in favor of a divorce, and on November 15th the amendments to the bill of complaint were filed. On November 24th, 1905, the court entered a decree in favor of complainant for a divorce from the bond of matrimony, giving her $4,000 as permanent alimony, and the custody of the younger child.   From this decree, defendant has appealed to this court.

It is contended that the amendments to the bill of complaint were improperly allowed, and counsel cite in support of their contention: *Briggs* v. *Briggs*, 20 Mich. 34; *Green* v. *Green*, 26 Mich. 437.   We do not find it necessary to determine this question, since we have come to the conclusion that even if the amendments were properly allowed, the complainant has not made out her case.

It appears from the record that on three occasions complainant's mind has become deranged. On the first occasion, she was treated at home under the care and instructions of competent physicians; on the second occasion, she was taken to a private asylum, and on the third, to the State asylum at Pontiac under the order of the judge of probate. Her insanity seems to have yielded to treatment, and upon her recovery she apparently regained her normal mentality. In the opinion of Dr. Christian, medical superintendent of the Eastern Michigan asylum, and other eminent alienists and physicians, there is a strong probability of a recurrence of her insanity. The specific acts of cruelty complained of are closely related in time to the periods of complainant's insanity, and the inference from the bill of complaint and the proof is quite irresistible that the basis of this suit is the restraint necessarily imposed upon complainant when she was not in possession of her faculties. I think the complainant has failed to make out a case of extreme cruelty. The charge of cruelty depends mainly upon complainant's own testimony. The charge of cruelty in compelling her to work in the field is not sustained. I think the most of her statements are but the imaginations of a diseased mind. Certainly the charge of cruelty in confining her in a sanitarium and in the asylum are not sustained. On these occasions, she was violently insane, and yet in her bill she charges such acts to be extreme cruelty; that she worked in the field is true, but she had done that before her marriage when living with her father. She testified:

"I helped around in the field from the time I was 13 until I was married. I drove the hayfork once in a while; worked in the hay fields, pitched hay and bundles, and did all kinds of work."

Her own father testified that his wife and daughters all thus worked. She testified that up to the time her first baby was born she helped her husband in the field the same as she had her own father, and did it willingly. The witnesses who were employed on the farm by the de-

fendant say that defendant treated his wife kindly, and they saw no trouble between them. After her return from the asylum, defendant sold his farm and moved to Detroit, and she herself testified that they had no particular trouble there until the Sunday before she left when some words arose between them because the defendant chided her for whipping the children too severely. If the testimony of the neighbors is to be believed, there were good grounds for this complaint on his part. The defendant positively denied the use of any of the language charged or any of the acts of cruelty. In her fits of insanity, it was necessary to use force, and no greater force was used than was necessary. The reason given by her for abruptly leaving her husband is significant. She testified:

"I was afraid he would take me away again; he quarreled with me again at that time, and told me I was using the children in a very mean way; that I misused the children and for the last four weeks they were just as if they were in jail. They did not have their own way at all. * * * I thought it would be wrong if they took me away. I thought they were going to take me away and was afraid they would do so, that was the reason I left the house that evening; I told my husband I was going; he said I should go, and I went to my brother's and the next day to my parents."

She did not take any of the children with her.

I think the decree should be reversed, and the bill dismissed.

CARPENTER, C. J., and McALVAY, GRANT, and MOORE, JJ., concurred.